UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
(MILWAUKEE DIVISION)

---

NANCY DEWEY, individually and as trustee
for THE NANCY DEWEY LIVING TRUST,
THE NANCY DEWEY 2015 NEA GRANTOR RETAINED
ANNUITY TRUST, THE NANCY DEWEY 2015 P&D
GRANTOR RETAINED ANNUITY TRUST, THE
IRREVOCABLE TRUST FOR THE GRANDCHILDREN
OF NANCY AND DOUGLAS DEWEY, and
JOHN DEWEY individually and as trustee for
THE JOHN D. DEWEY LIVING TRUST,                    Case No. _____
THE JOHN D. DEWEY IRREVOCABLE
CHILDREN'S TRUST, THE ABIGAIL
DEWEY IRREVOCABLE TRUST, THE ERIN
DEWEY IRREVOCABLE TRUST,
THE IAN DEWEY IRREVOCABLE TRUST,
THE SHEAMUS DEWEY IRREVOCABLE TRUST,
THE ABIGAIL DEWEY DESCENDANT'S TRUST,
THE ERIN DEWEY DESCENDANT'S TRUST,
THE IAN DEWEY DESCENDANT'S TRUST,
THE SEPARATE TRUSTS FOR IAN DEWEY,
SHEAMUS DEWEY, ERIN DEWEY AND ABIGAIL DEWEY, and
THE SHEAMUS DEWEY DESCENDANT'S TRUST,

     Plaintiffs,

v.

KURT BECHTHOLD, MARK FILMANOWICZ, DAVID BECHTHOLD,
JOHN G. SORENSON, PAYNE & DOLAN, INC., NORTHEAST ASPHALT,
INC., CONSTRUCTION RESOURCES MANAGEMENT, INC., ZENITH TECH,
INC., and TIMBERSTONE OF RICHFIELD, INC.,

     Defendants.

---

**COMPLAINT**

---

Plaintiffs Nancy Dewey ("Nancy") and John Dewey ("John"), individually and as trustees for the plaintiff trusts ("Plaintiff Trusts"; together with Nancy and John, "Plaintiffs"), for their Complaint against Defendants, allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action in order to protect their fundamental rights as minority shareholders in the defendant companies—an interrelated group of highly successful family-owned corporations that dominate the asphalt production and road and bridge construction business in Wisconsin (collectively, the "Companies" or the "Walbec Group").[1] Plaintiffs want to sell their minority shareholder interest in the Companies, which may be worth hundreds of millions of dollars. But Defendants are intent on depriving Plaintiffs of the value of their ownership interests, undermining Plaintiffs' reasonable expectations, and intentionally freezing and squeezing Plaintiffs out of the Companies at an unreasonable price.

2. Defendants have followed a classic freeze-out/squeeze-out oppression formula to attempt to accomplish their unlawful goals. They began with the freeze-out, pushing Plaintiffs out of any positions of authority in the Companies and cutting off communications with Plaintiffs about the status of the Companies, the Companies' investments, and the value of Plaintiffs' ownership interests. Defendants have unlawfully deprived and prevented Plaintiffs from obtaining and reviewing accounting records and financial information about the Companies, information to which Plaintiffs are entitled and which Plaintiffs have demanded for proper purposes to value their shares. Defendants repeatedly ignored their legal obligations to provide the required access and documents, and instead have offered—on an oppressively untimely basis—incomplete, outdated, and misleading summary information that fails to meet its

---

[1] The Companies include Defendants Payne & Dolan, Inc. ("P&D"), Northeast Asphalt, Inc. ("NEA"), Construction Resources Management, Inc. ("CRM"), Zenith Tech, Inc. ("Zenith Tech"), and Timberstone of Richfield, Inc. ("Timberstone").

2

statutory and common law obligations. There is no legitimate business purpose for withholding the accounting records from Plaintiffs other than to prevent Plaintiffs from determining the value of their investments, or to prevent inquiry into whether improper transactions have occurred.

3. While operating in the dark and in complete control of the Companies, Defendants laid the groundwork for the eventual squeeze-out. Defendants adopted punitive share restrictions that they now seek to enforce against Plaintiffs if Plaintiffs hope to sell their shares in the Companies. The share restrictions require Plaintiffs to first offer their shares to the Companies and the other shareholders, and that Plaintiffs must make this offer at *book value* rather than *fair market value*. Book value is not appropriate as a valuation methodology for large operating companies like the Companies—where the true value of the business is as a going concern, based on the future cash flows of the company, not how the company happens to carry its assets on its books. Worse yet, the Companies assert that this book value must be determined based upon the Companies' own financial statements, which are manipulated for the specific purpose of driving down book value. This is shareholder oppression under Wisconsin law.

4. To further their oppression scheme, Defendants have, upon information and belief, significantly manipulated book value to artificially depress and substantially understate the "book value" in at least the following ways:

a. Assets of the Companies that are owned or partially owned by the Companies are not reflected at all on the books and records of the Companies;

b. Company accountants have aggressively depreciated real estate and other assets on the Companies' financial statements such that those assets (such as real estate or expensive cranes and construction equipment) are carried at a fraction of their real value; and

c. Defendants instructed its accountants to use accounting methods that do not comply with GAAP, despite a clear requirement in Company bylaws that financial statements must be prepared in accordance with generally accepted accounting principles.

3

5.      Prior to initiating this litigation, Plaintiffs conducted an independent investigation of the Companies' assets and discovered that the Companies have hidden assets worth tens of millions of dollars which, upon information and belief, are not on the Companies' books. The independent investigation revealed that Defendants misrepresented the number of properties owned by the Companies and failed to disclose significant, valuable mining operations—which earn millions of dollars per year—conducted on some of these undisclosed properties. Defendants have improperly omitted these assets and the economic activity derived from these assets from the summary financial information and property reports provided to Plaintiffs. Upon information and belief, Defendants are keeping for themselves, and depriving from Plaintiffs, the value of the undisclosed assets, either to augment the value of the Companies once Plaintiffs have been bought out, or in outright, off-the-books payments to themselves and/or theft or misdirection of corporate opportunities.

6.      Defendants are oppressing Plaintiffs; breaching fiduciary duties owed to Plaintiffs; deliberately misrepresenting the value of the Companies to Plaintiffs for the purpose of depriving Plaintiffs of the opportunity to realize the full and fair market value of their ownership; and, upon information and belief, committing fraud. None of the other owners, who are all aligned with Kurt Bechthold and whose interests he has the right to vote, are being treated in this manner.

7.      Defendants' conduct detailed in this Complaint is expressly prohibited under Wisconsin law. Plaintiffs seek all legal and equitable relief available to them to redress these wrongs, including appointment of a Receiver to (1) conduct a forensic accounting of the Companies' accounting records; (2) identify any and all assets and interests owned by the Companies, including those assets and interests that are not included in the Companies'

4

accounting records; (3) determine whether the Companies engaged in improper transactions and/or whether the Companies' assets or opportunities have been used to purchase, establish, or support operations and/or businesses outside the ownership of Plaintiffs; and (4) determine the book value and fair market value of Plaintiffs' minority shareholder interests in the Companies.

## PARTIES

8.      Plaintiff Nancy Dewey ("Nancy") is an adult resident of the State of Florida, residing at 3377 Gulf Shore Blvd, Apt. 5, Naples, FL 34103. Nancy is Walter Bechthold's daughter and John Dewey's mother. Nancy brings this lawsuit individually and as the trustee of the Nancy Dewey Living Trust, the Nancy Dewey 2015 NEA Grantor Retained Annuity Trust, the Nancy Dewey 2015 P&D Grantor Retained Annuity Trust, and the Irrevocable Trust for the Grandchildren of Nancy and Douglas Dewey (collectively, the "Nancy Dewey Trusts"). Through the Nancy Dewey Trusts, Nancy is the beneficial owner of approximately: 12.16% of P&D; 1.11% of NEA; 33.33% of Zenith Tech; and 19.78% of Timberstone. From the late 1970s to 2015, Nancy also served on the Companies' Boards of Directors.

9.      Plaintiff John Dewey ("John") is an adult resident of the State of Florida, residing at 14731 Eden Street, Fort Myers, FL 33908. John is Walter Bechthold's grandson and Nancy's son. John brings this lawsuit individually and as the trustee of the John D. Dewey Living Trust, the John D. Dewey Irrevocable Children's Trust, the Abigail Dewey Irrevocable Trust, the Erin Dewey Irrevocable Trust, the Ian Dewey Irrevocable Trust, the Sheamus Dewey Irrevocable Trust, the Abigail Dewey Descendant's Trust, the Erin Dewey Descendant's Trust, the Ian Dewey Descendant's Trust, the Separate Trusts for Ian Dewey, Sheamus Dewey, Erin Dewey, and Abigail Dewey established under the October 22, 2004 Trust Agreement for the

5

Irrevocable Trust for the Grandchildren of Nancy and Douglas Dewey, and the Sheamus Dewey Descendant's Trust (collectively, the "John Dewey Trusts," together with the Nancy Dewey Trusts, "Plaintiff Trusts"). Through the John Dewey Trusts, John is the beneficial owner of approximately: 6.49% of P&D; 10.83% of NEA; 14.81% of CRM; and 3.77% of Timberstone.

10.     Defendant Kurt Bechthold ("Kurt") is an adult resident of the State of Wisconsin, residing at 9701 N. Columbia Drive, Mequon, WI 53092. Kurt is Walter Bechthold's grandson and Ned Bechthold's ("Ned") son. Kurt is the CEO of the Companies and owns or controls a majority of the voting shares in the Companies. Kurt has been a member of the Boards of Directors of the Companies since 2013, when, following the reconstitution of the Boards, he succeeded to the role of Chairman on each of the Companies' Boards. Upon information and belief, Kurt owns, either individually or through trusts or other holding entities, significant interests in the Companies.

11.     Defendant David L. Bechthold ("David") is an adult resident of the State of Wisconsin, residing at W303N1683 Arbor Drive, Delafield, WI 53018. David is Kurt's brother. He joined the Companies approximately twenty-five years ago. Between August 1993 and August 2000, David worked as a project manager for Zenith Tech and became CEO of Zenith Tech in 2000. David owns, either individually or through trusts or other holding entities, significant interests in the Companies.

12.     Defendant Mark Filmanowicz ("Filmanowicz") is an adult resident of the State of Wisconsin, residing at W291N3897 Round Hill Circle, Pewaukee, WI 53072. Filmanowicz has been with the Companies since at least 1996. He served as the Companies' Executive Vice President, Chief Legal Officer, and Secretary until 2013. In or about 2013, Filmanowicz was promoted to President of the Companies.

6

13.     Defendant John G. Sorenson ("Sorenson") is an adult resident of the State of Wisconsin, residing at N62 W29820 Stoney Hill Court, Hartland, WI 53029. Sorenson joined the Companies as CFO in 2006 and stayed in that role until his departure from the Companies in or about May 2018.

14.     Defendant Payne & Dolan, Inc. ("P&D") is a non-statutorily closely-held Wisconsin corporation with a principal place of business in Waukesha, Wisconsin. Mark Filmanowicz is P&D's registered agent. P&D is a paving, construction and engineering company operating in Wisconsin, Michigan, and Illinois. P&D is primarily engaged in commercial construction for state and federal governments.

15.     Defendant Northeast Asphalt, Inc. ("NEA") is a non-statutorily closely-held Wisconsin corporation with a principal place of business in Outagamie, Wisconsin. Mark Filmanowicz is NEA's registered agent. NEA is an asphalt production and construction services company operating in Wisconsin, Michigan, and Illinois.

16.     Defendant Construction Resources Management, Inc. ("CRM") is a non-statutorily closely-held Wisconsin corporation with a principal place of business in Waukesha, Wisconsin. Mark Filmanowicz is CRM's registered agent. CRM is a construction management services company that provides services to P&D, NEA, and Zenith Tech.

17.     Defendant Zenith Tech, Inc. ("Zenith Tech") is a non-statutorily closely-held Wisconsin corporation with a principal place of business in Waukesha, Wisconsin. Mark Filmanowicz is Zenith Tech's registered agent. Zenith Tech is primarily engaged in engineering and heavy civil construction, including dams, bridges, power plants, highways and foundations, and the operation of heavy equipment.

18.     Defendant Timberstone of Richfield, Inc. ("Timberstone") is a non-

7

statutorily closely-held Wisconsin corporation with a principal place of business in Washington, Wisconsin. Mark Filmanowicz is Timberstone's registered agent. Timberstone manages a retired quarry that was converted into a housing development.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial number of the events giving rise to this action occurred in this District, the defendants reside or are located in this District, and because a substantial part of the property that is the subject of this action is situated in this District.

## SUBSTANTIVE ALLEGATIONS

### I.    THE HISTORY OF THE COMPANIES AND THE FOUNDATION FOR PLAINTIFFS' "REASONABLE EXPECTATIONS"

21.     In 1925, after working as Racine highway commissioner, Walter Bechthold ("Walter")—Nancy's father and John's grandfather—joined the Chicago-based partnership of Payne & Dolan. At the time, Payne & Dolan was a small highway construction business seeking to expand its operations into Wisconsin. Walter began building Payne & Dolan into Wisconsin, and by 1958, he had secured sole control of Payne & Dolan. Walter grew P&D into the largest asphalt, construction, and project management company in Wisconsin. Walter also created additional entities to own and manage other parts of the business as the operations and profits grew, including, without limitation, NEA, CRM, Zenith Tech, Timberstone, and certain limited liability companies that were created for the purpose of investing outside the core construction businesses.

Case 2:18-cv-01739-NJ   Filed 11/01/18   Page 8 of 39   Document 1

22.     Walter passed his ownership interests in the Companies and related entities *equally* to his three children, Nancy, Ned Bechthold ("Ned"), and Ellen Bechthold ("Ellen"). Nancy and Ned, in turn, have passed limited ownership interests to their children (including Nancy's son John) through various trusts, including the Plaintiff Trusts, and other estate planning mechanisms. Nancy reasonably expected that she would be treated fairly and equally as a 33% owner of the Companies and that Nancy and her children would be able to realize the value of their ownership interests in the Companies.

23.     After Walter's retirement, Nancy, Ned, and Ellen comprised the three-person board of each Company, and Ned ran the day-to-day business operations. In or about 1999, Ned ceded control of the operations to his son (Nancy's nephew), Kurt Bechthold ("Kurt"). Kurt became President of each of the Companies at that time. In the ensuing years, Kurt seized control of the Companies. By 2013, Kurt was the CEO of each of the Companies other than Zenith Tech (where Ned had installed his son, David, as CEO) and Chairman of the Board of Directors for each Company. Kurt controls a majority of the voting shares of the Companies. Many other close Bechthold family members and those loyal to Kurt, such as Filmanowicz and (formerly) Sorenson, are installed in positions of power or are on the payroll of the various Companies. Each Company has seven identical members on the Boards of Directors, with Kurt acting as Chairman of each Board; Board and shareholders meetings for each Company are held jointly and simultaneously, with identical minutes for each meeting except for the name of the entity; and each Company has an identical charter and bylaws.

24.     In the spring of 2013, John complained about the Bechtholds' mismanagement of the Companies' affairs, including their refusal to provide shareholders with a reasonable return on their investment in the form of dividends and the excessive compensation

9

(in the millions of dollars annually) that the Bechtholds paid themselves and those loyal to them. In response, Kurt used his power and control of the Companies to reshape the boards and to freeze out Nancy and John.

25. The original bylaws for each Company stated that when Nancy, Ned, or Ellen stopped serving on the three-person Board of Directors, their children could choose a replacement director. The obvious intent was to maintain equality among the families on the Boards of Directors for the Companies. After John complained about the Bechthold's corporate governance, however, the Bechthold's changed the rules. On June 4, 2013, Filmanowicz informed Nancy that a Board meeting for each Company would be held three days later for the purpose of (a) voting on a resolution repealing the long-standing bylaw that controlled the succession of Board members; (b) voting on a resolution to increase the size of Board from three to seven directors; and (c) nominating directors to fill those seven seats.

26. Nancy objected to holding the meetings at that time because she was scheduled to have an emergency medical procedure at the Mayo Clinic and requested that the meeting be moved two weeks. Nancy's requests were ignored, and the board repealed the longstanding succession bylaw and voted to increase the size of the Board to seven members, adding four new members, including two new outside directors, who had been handpicked by the Bechtholds. The Companies' majority shareholders then proceeded to elect the seven nominated directors. With this vote, the Bechtholds diluted the Deweys' representation on the board from 33% to 14%, and further solidified their control of the Companies at the expense of the Deweys.

27. Today, the Companies are more valuable than ever. On information and belief, they carry little to no debt, generate substantial annual revenue (estimated to be REDACTED REDACTED ) and substantial annual profits (estimated to be REDACTED ), and own a vast

10

portfolio of real property throughout Wisconsin, Michigan, and Illinois. The Companies are also vertically integrated, which creates enormous operational efficiencies and cost savings. The companies own the land where the raw materials used for building roads and highways are mined; they own the processing facilities where the raw materials are processed into construction materials; they own the transport systems that move the materials to the various building sites; they own the heavy equipment used to construct the various projects; and they maintain the technological infrastructure and engineering services needed to support their projects. The Companies dominate asphalt production and road and bridge construction in Wisconsin and nearby states and hold significant sums of cash, amounting to REDACTED if the outdated financial statements provided to Plaintiffs by the Companies are to be believed.

28. The Companies also own massive amounts of valuable land, REDACTED REDACTED . This land is valuable for its strategic locations, operational advantages, and other factors, and also because it can be repurposed for additional revenue generation. As an example, Defendant Timberstone converted a retired quarry into a luxury housing development, creating significant returns for the Companies.

29. As described in detail herein, Defendants are engaging in a textbook freeze-out/squeeze-out minority oppression scheme aimed at depriving Plaintiffs the value of their ownership interest in the Companies and intentionally and directly undermining Plaintiffs' reasonable expectations about their ownership in the Companies. Kurt, along with his family and allies, including Filmanowicz and Sorenson, has secured complete control of the Companies, has excluded Nancy and John from participating in the Companies' affairs, and now has refused to give Nancy and John basic and accurate information about the value of their holdings.

## II. DEFENDANTS SEEK TO IMPOSE AND ENFORCE OUTDATED, PUNITIVE, AND OPPRESSIVE SHARE TRANSFER RESTRICTIONS AGAINST PLAINTIFFS.

30. In 1967, the Companies adopted a "Restrictions on Sale or Transfer" that the Companies claim were "adopted by unanimous vote on November 13, 1967" (the "1967 Restriction"). According to the 1967 Restriction, the Companies' stock could not "be sold, transferred, assigned, pledged or otherwise disposed of," except upon compliance with certain conditions set forth in the restriction:

> First, that such stock shall have been offered to the corporation for a period of thirty days at the option price hereinafter provided and second, if not purchased by the corporation during said thirty day period, that the stock shall have been offered to the other holders of the same class of stock at the same option price for a period of thirty days after expiration of the first thirty day period. If, at the expiration of the two periods of third days, the stock offered or any part thereof shall not have been purchased by the corporation or by other stockholders, the stockholder making the offers may sell, assign or transfer the shares offered but not purchased, to any person, firm or corporation, provided such sale, assignment or transfer be consummated within sixty days after expiration of the last of the two thirty day periods.

31. The 1967 Restriction set the option price as:

> [T]he book value of the stock determined by a balance sheet stated according to recognized accounting practice as of the end of the calendar month preceding the offer to the corporation and in such balance sheet no value shall be assigned to any good will but the value of all contracts and work in progress shall be included on a percentage of completion basis according to recognized accounting practice.

32. Under Wisconsin law, when a transfer restriction sets the purchase price as book value, "'book value' is not any arbitrary value that may be entered on the books of a corporation but rather is value predicated on the *market value* of the assets of a corporation." *Whitman v. Whitman*, 34 Wis. 2d 341, 348, 149 N.W.2d 529 (1967) (emphasis added) (quoting *Townsend v. La Crosse Trailer Corp.*, 254 Wis. 31, 36, 35 N.W.2d 325 (1948)); *see also Schumann v. Samuels*, 31 Wis. 2d 373, 377, 142 N.W.2d 777 (1966).

12

33.     On December 21, 1993, the Boards for the Companies adopted "Revised and Restated Bylaws," thereby rendering the 1967 Restriction null and void. In its place, the Boards enacted an even more restrictive bylaw, Section 2.14 (the "1993 Restriction"). The 1993 Restriction stated that it could "only be amended or revoked by the vote of ninety percent (90%) or more of the shareholders," and significantly altered the method for calculating the option price at which shares were required to be offered for sale to the corporation and its shareholders. The 1993 Restriction set the option price as:

> [T]he book value of the stock determined by the corporation's balance sheet included in its financial statements and stated in accordance with generally accepted accounting principles consistently applied as of the end of the calendar month preceding the offer to the corporation and in such balance sheet no value shall be assigned to any good will but the value of all contracts and work in progress shall be included on a percentage of completion basis in accordance with generally accepted accounting principles.
>
> [Additions from 1967 Restriction underlined.]

34.     Unlike the 1967 Restriction under which book value would be determined based upon the *market value* of the Companies' assets minus the Companies' liabilities, the 1993 Restriction required a shareholder to offer his or her stock to the Companies at book value based upon the value that the assets are carried on the Companies' financial statements.

35.     As an initial matter, the 1993 Restriction cannot apply to John's shares in the Companies. Under Wisconsin law, a transfer restriction, like the 1993 Restriction, "may not affect shares . . . issued before the restriction is adopted unless the holders of the shares . . . vote in favor of the transfer restriction." Wis. Stat. § 180.0627(2)(b). Accordingly, the 1993 Restriction did not apply to shares issued prior to December 21, 1993 that were held by shareholders, like John, who did not vote in favor of 1993 Restriction.

36.     In 2014, the Companies sought to implement a few minor changes to the

1993 Restriction. The Companies had identified certain language in the 1993 Restriction that could potentially render transfers that had been made to certain trusts invalid. The Companies also sought to change the requirement in the 1993 Restriction of a "vote of ninety percent (90%) or more of the shareholders" to read "at least ninety percent (90%) of the outstanding shares" of the relevant corporation's stock.

37. The Companies sought John's support for the proposed changes. John unequivocally stated that he did not support the existing share restriction and he would not vote in favor of the proposed changes to a transfer restriction he had long opposed. In a successful effort to induce John to vote in favor of the transaction, the Companies "agreed that they [would] not assert that [John's] votes in favor of the two bylaw changes and the ratification . . . in any way estop him from challenging the bylaws."

38. On June 9, 2014, the 1993 Restriction was amended and restated to address these concerns (the "2014 Restriction," together with the 1967 Restriction and the 1993 Restriction, the "Transfer Restrictions"). John's counsel included a letter in the minutes of the meeting at which the resolutions revising the 1993 Restriction were passed that further memorialized the Companies' agreement that John's willingness to assist the Companies in their efforts to correct mistakes in the 1993 Restriction would not constitute a "vote in favor of the transfer restriction." This letter specifically noted that John's votes "are not and should not be construed as an acceptance by Mr. Dewey of the bylaws" and that "Mr. Dewey objects . . . to the right-of-refusal provisions that remain in the bylaws, including the option price for stock purchases, which is improperly limited to the book value of the stock without appropriate consideration of fair value."

39. Notwithstanding these representations upon which John justifiably relied,

the Companies now claim that John's shares are subject to the 2014 Restriction, rendering the Companies' statements to induce John to vote in favor of the 2014 Restriction fraudulent.

40.     Even if John had not been defrauded by Defendants, book value (especially based on "the corporation's balance sheet included in its financial statements") is not an appropriate valuation methodology for calculating the value of shares in the Companies under the facts of this case. For a going concern operating company, meaning a company that is continuing to operate and sells good or services, the acceptable and customary methodology for valuing a company is based on its projected cash flows. This valuation methodology is less susceptible to abuse and manipulation in the value of a company's assets, and results in estimates of value based on what shareholders care about—namely, the future cash generation of a business. The continued use of book value to determine the sale price of a shareholder's shares in the Companies was unreasonable on its face in 1993, and continues to be so today.

41.     Beyond that, a "book value" valuation methodology is subject to manipulation from the company and/or majority shareholders and persons controlling the company, which is exactly what Defendants are doing.

III.    **DEFENDANTS ARE MANIPULATING THE COMPANIES' FINANCIALS TO REDUCE THE BOOK VALUE OF THE SHAREHOLDERS' OWNERSHIP INTERESTS TO PLAINTIFFS' DETRIMENT.**

42.     At Kurt's direction, and with the assistance and participation of David, Filmanowicz, and (before he separated from the Companies) Sorenson, as persons in control of the corporation, Defendants are manipulating the financial statements to reduce the book value of Plaintiffs' shares far below their fair market value, perhaps by hundreds of millions of dollars. The manipulation of the book value is directed solely and specifically at Plaintiffs, who are the only shareholders who seek to sell their shares and who, unlike the Individual Defendants and

15

other shareholders loyal to the Bechtholds, do not hold any positions of authority in the Companies and are not privy to the Companies' accounting records.

43.     Defendants have gone beyond even the most aggressive depreciation permitted under generally accepted accounting principles ("GAAP") to devalue the Companies' assets. In the limited financial statements of the Companies that Plaintiffs have seen, the Companies admit that they calculate depreciation using "accelerated methods" that "differ" from "generally accepting accounting principles." This admission is highly consequential because the bylaws require book value to be calculated according to GAAP. The Companies depreciate their assets—thereby removing the assets' value from any calculation of book value based upon the Companies' books—20-50% faster than the 200% double declining balance method recognized by GAAP, which results in a massive undervaluation of valuable depreciable assets in this *ultra vires* calculation of "book value"—all to the detriment of the value of Plaintiffs' ownership. The result is that the Companies' highly valuable assets—including heavy equipment (earth moving equipment and cranes), buildings, as well as asphalt processing plants, machinery, and storage tanks—are grossly understated on the Companies' books, relative to their fair market value.

44.     One example of extreme undervaluation under this oppressive formula is the asphalt storage tanks owned by the Companies. Defendant CRM owns REDACTED REDACTED . Because of the hyper-aggressive depreciation utilized by Defendants, CRM's 2016 year-end financial statements carry *all* of its Property, Plant and Equipment (which, in addition to asphalt storage tanks, includes land, land improvements and buildings, machinery, furniture and fixtures, autos and trucks, and construction-in-progress) on its books at a value of REDACTED — more than *four times* less than the fair market value of CRM's storage tanks alone.

16

45.     P&D's financial statements show that P&D's Property, Plant, and Equipment are worth REDACTED                . Even putting aside the accuracy and completeness of P&D's financial statements, in a valuation based upon the book value of P&D's assets as reflected in P&D's financial statements, P&D's aggressive depreciation removes REDACTED REDACTED          .

46.     Plaintiffs have also identified a series of properties and facilities owned by the Companies that have significant value that far exceeds the very low value at which the Companies are believed to carry these properties and facilities on their books. The business value of these parcels and operations has been confirmed by permits granted by the Wisconsin Department of Natural Resources to the Companies' asphalt plants and gravel pits and the estimated annual value of the Companies' mining operations is based upon materials prices published by the Wisconsin Department of Transportation. Set forth below are but a few of the facilities owned by the Companies that have significantly higher market value than the county estimated property value, much less the aggressively depreciated value used by the Companies:

| Facility Name | Listed Address | Town or City | Operations | Est. Annual Sales | County Estimated Property Value (Rounded) |
|---|---|---|---|---|---|
| Combined Franklin Sites[2] | Rawson Ave. | Franklin | Crushed & Broken Limestone; Asphalt Paving Mixtures & Blocks | $26.43 million in asphalt plus $40 to $85 million in aggregate | $8.23 million |
| Payne & Dolan - #2 | N250 W233 Highway 164 | Waukesha | Asphalt Paving Mixtures & Blocks | $32.18 million | $12.27 million |

---

[2] Consists of the Franklin Aggregates site (6211 W Rawson Ave.); the #7 Franklin site (N3 W23650 Badinger Rd.); the Control 3 site (5831 W Rawson Ave.); and the Franklin North Quarry (5713 W Rawson Ave.).

17

| Facility Name | Listed Address | Town or City | Operations | Est. Annual Sales | County Estimated Property Value (Rounded) |
|---|---|---|---|---|---|
| Northeast Asphalt #65 | 1524 Atkinson Drive | Green Bay | Asphalt Paving Mixtures & Blocks | $26.08 million | $1.52 million |
| Northeast Asphalt Inc. Control #64 | 2500 Cold Spring Road | Menasha | Asphalt Paving Mixtures & Blocks | $17.92 million | $434,900 |
| Payne & Dolan #23 | 1740 120th Avenue | Kenosha Town of Paris | Asphalt Paving Mixtures & Blocks | $14.42 million | $1.33 million |
| Payne & Dolan - La Grange Control | W6615 U.S. Highway 12 | La Grange | Asphalt Paving Mixtures & Blocks | $12.65 million | $1.14 million |
| Northeast Asphalt - #57 | W3194 County Road F | Eden | Asphalt Paving Mixtures & Blocks | $11.17 million | $102,600 |
| Payne & Dolan Inc - Dousman Aggregates | 1523 Cnty Highway C | Dousman / Ottawa | Construction Sand and Gravel | $9.36 million to $19.75 million | $1.23 million |
| Northeast Asphalt - Lawrence Quarry #87002 | 1950 Scheuring Road | De Pere | Crushed and Broken Stone | $9 million to $19 million | $1.15 million |
| Payne & Dolan - #1 | W250N8097 Hillside Road | Town of Lisbon | Asphalt Paving Mixtures & Blocks | $8.83 million | $1.93 million |
| Northeast Asphalt #67 | 1780 Scray Hill Road | Glenmore | Asphalt Paving Mixtures & Blocks | $10.87 million | $4.10 million |
| Payne & Dolan -#12 | W217S8415 Crowbar Drive | Muskego (Janesville Road) | Asphalt Paving Mixtures & Blocks | $7.65 million | $1.57 million |

18

| Facility Name | Listed Address | Town or City | Operations | Est. Annual Sales | County Estimated Property Value (Rounded) |
|---|---|---|---|---|---|
| Payne & Dolan Inc - Racine Quarry | 1501 3 Mile Road | Racine | Crushed and Broken Limestone | $7.21 million to $15.23 million | $1.45 million |
| Northeast Asphalt - #56 | 900 Berlin Road (County FF) | Ripon | Asphalt Paving Mixtures & Blocks | $6.99 million | $90,700 |
| Payne & Dolan Inc Rugby Junction Control #11 | 2759 Scenic Road | Polk | Asphalt Paving Mixtures & Blocks | $3.31 million | $289,300 |
| Payne & Dolan: Honey Creek Site | 34604 Washington Ave. | Waterford | Construction Sand and Gravel | $1.92 million to $4.01 million | $2.19 million |
| **TOTAL** | | | | **$257.39 to $332.89 million** | **$39.7 million** |

47.     Based on the aggressive manner in which the Companies depreciate their assets, and the extremely low carrying value of the assets on the Companies' books, the book value that Defendants seek to impose on Plaintiffs is oppressive. Defendants' accounting manipulation (and suspected additional manipulation Plaintiffs have yet to confirm based on Defendant's refusal to provide the accounting records underlying the Companies' financial statements) makes it impossible for Plaintiffs to accurately value their shares, and through their control of the Companies, the Individual Defendants have insisted on these aggressive and unusual practices to deprive Plaintiffs of their ability to sell their shares at anything close to fair value, robbing them of potentially hundreds of millions of dollars. Plaintiffs are left with the Hobson's choice of keeping their minority interests in the Companies, which are completely

controlled by company insiders like Kurt, David, Filmanowicz, and (formerly) Sorenson with almost no information about the operations and/or finances of the Companies, or selling their shares to the Companies or other shareholders at an artificially depressed book valuation.

## IV. DEFENDANTS REFUSE TO PROVIDE ACCOUNTING RECORDS TO PLAINTIFFS AS REQUIRED BY WISCONSIN LAW, AND, UPON INFORMATION AND BELIEF, HAVE CONCEALED ASSETS FROM PLAINTIFFS IN ORDER TO FURTHER DEFLATE THE VALUE OF PLAINTIFFS' OWNERSHIP INTERETS IN THE COMPANIES.

48. Defendants will not permit Plaintiffs to sell their shares until after they have offered the shares to the Companies, and then to the Companies' other shareholders, at book value "determined by [each company's] balance sheet included in its financial statements and stated in accordance with generally accepted accounting principles consistently applied." Putting aside whether this Transfer Restriction is enforceable against Plaintiffs, determining the price at which Plaintiffs are purportedly required to offer their shares requires that Defendants provide them with the complete and accurate financial information for the Companies. Plaintiffs are entitled to accounting records that go behind the summary financial statements provided to Plaintiffs in order determine and verify the value of their shares, assess reasonable expectations of shareholders concerning dividends, become intelligibly informed about corporate affairs of the Companies, and determine whether improper transactions have occurred. But Defendants have refused to provide the accounting records they are statutorily required to provide to Plaintiffs.

49. Beginning in December 2015, Plaintiffs, through counsel, repeatedly requested documents and information related to the Companies' finances and assets. Defendants, through counsel, provided only minimal financial information in response to Plaintiffs' requests and refused to provide accurate and complete accounting records underlying the summary financial statements provided to Plaintiffs. The following are examples of the repeated requests

to Defendants:

    a. On December 4, 2015, Plaintiffs' former counsel requested: (1) the Companies' income tax returns for the last five years; (2) the latest interim financial statements (and interim financial statements for the comparable period of the previous year); (3) the current list of assets owned by the Companies not directly used in business operations, together with estimates of the current market value of these non-operating assets (and, as to the land within this category, the most recent property tax bills); and (4) any company budget, business plan and financial projections currently in place, or if none, then the most recent such budget, business plan, and financial projections.

    b. On January 22, 2016, Defendants' counsel provided Plaintiffs with certain, but not all, of the requested materials, including financial statements pertaining to the Companies through 2014, certain tax returns pertaining to the Companies, certain valuation reports prepared for P&D and NEA, and certain investment reports. Defendants failed to provide any information relating to the Companies' assets (including property owned by the Companies) and failed to provide any information about the Companies' financial projections, despite being specifically requested.

    c. On March 17, 2016, Defendants' counsel sent two files, which he represented as "sheets show[ing] real estate owned in P&D and NEA." However, the files were missing critical details regarding the properties, including any identifiable addresses, and as discussed below, omitted numerous highly valuable properties owned by the Companies.

    d. On July 29, 2016, Plaintiffs' counsel requested financial projections prepared in the last eighteen months for CRM, P&D, and NEA; state and federal tax returns for CRM; and 2015 real estate tax statements for the real property owned by CRM, P&D, NEA, and Timberstone to supplement the incomplete information provided by email in March 2016. Then, on November 30, 2016, Plaintiffs' former counsel sent another letter seeking to formally inspect and copy records of CRM, P&D, and NEA in accord with Wis. Stat. § 180.1602 on or after December 7, 2016, "for the purpose of assisting the Deweys in valuing their shares, assessing reasonable expectations of shareholders concerning dividends, and being intelligibly informed about corporate affairs." Plaintiffs' counsel reiterated requests for many of the items he had previously requested but had not received, as well as several additional categories of information pertaining to (1) stockholder information; (2) subsidiary and investment information; (3) real estate; (4) fixed asset data; (5) other financial data; (6) financial statements; and (7) dividend expectations.

    e. Defendants' counsel responded on December 7, 2016, stating in part that the Companies were "not inclined simply to undertake the considerable expense that they would incur by complying with the current demand, without first

21

giving careful consideration to their legal obligation to do so."

f.  On February 13, 2016, Plaintiffs' counsel reiterated certain requests from his November 7, 2016 letter "to understand the assets [] h[e]ld" by the Companies. Specifically, he requested (1) a description of the real estate owned by CRM (including the most recent real estate tax bill for each parcel); (2) a listing of investment securities; (3) a listing of fixed assets; (4) details of repayment terms of any related party advances or loans; (5) a reconciliation of all intercompany assets; (6) copies of any related party equipment or property leases; and (7) a schedule of payments made in the last three years for goods or services rendered to CRM or any of its affiliated entities to individuals or entities owned in whole or in part by officers, directors or investors of CRM P&D, NEA, or Zenith Tech.

g.  On April 27, 2017, Plaintiffs' counsel followed up on previous requests for company tax returns and requested federal tax returns and accompanying schedules for Zenith Tech from 2010 through 2016. On May 2, 2017, he requested copies of the complete Form 1065s for a number of CRM's limited liability companies: Oakwood Holdings; Oakwood I Holdings; Rolling Prairie Holdings; Maplewood Associates LLP; Mayfair Road LLC; and Woodlake III LLC.

h.  On May 22, 2017, Defendants' counsel purported to provide the 2010 through 2015 returns (Form 1120S) for Zenith Tech, Inc. and the 2016 partnership forms (Form 1065, Sch. K-1) for Mayfair Road, LLC; Oakwood Holding, LLC; Oakwood I, LLC; Rolling Prairie Apartment Homes, LLC; and Wood Lake III, LLC. But Defendants did not provide any additional documents requested on November 30, 2016 and February 13, 2017.

i.  On July 27, 2017, Plaintiffs' counsel posed certain questions "aimed at obtaining a full and fair disclosure of any economic relationships whereby a subset of owners might benefit from company operations in a way that Nancy and John do not," and requested supporting documents related to these questions, including: Annual Certifications for compliance with the Companies' Code of Ethical Conduct and Corporate Compliance Program; quarterly reports to the Board of Directors; any audits relating to the Code; copies of the Companies' books and records from the 2012 to present where vendors have been compensated $500,000 or more and a list of such vendors; certain audit work papers; Audit Committee minutes relating to financial statements; and a schedule of all subsidiaries, LLCs, and partnerships owned by the Companies.

j.  In response, on August 8, 2017, Defendants' counsel provided summary responses to Plaintiffs' questions but did not provide any of the requested materials, stating instead that Plaintiffs "are not entitled to put the companies to the trouble and expense of gathering the documents."

22

k. On January 12, 2018, pursuant to their statutory inspection rights, Plaintiffs requested that the Companies provide certain financial data for the years ending December 31, 2015, 2016, and 2017, that Plaintiffs need in order to determine the value of their holdings—data that should be readily available to the Companies and that is not contained in the Companies' limited financial statements. Plaintiffs requested various documents relating to the Companies' financials for each of the Companies including: (1) general ledgers; (2) audit work papers; (3) schedule of cash amounts; (4) year-end bank reconciliations; (4) bank statements for each month; (5) analysis of inventory costs and purchases from vendors; and (6) annual financial statements, including for all joint ventures, partnerships, LLCs, corporations, or other similar entities. Plaintiffs also requested information relating to the Companies' assets and accounting for those assets. Plaintiffs renewed prior requests for an inventory of all assets owned by the Companies, as well as depreciation schedules for the Companies' assets. Plaintiffs further requested documents relating to the Companies' outstanding projects and expected receivables, including: (1) year-end costs for construction in progress; (2) summary of accounts receivable aging; and (3) a schedule of notes receivable.

l. In response, Defendants rejected outright Plaintiffs' request for information to which they are entitled as shareholders in order to value their shares. Defendants claimed that they had already provided Plaintiffs financial information about the Companies. But the information provided was woefully incomplete, manipulated, fraudulent, and concealed valuable assets of the Companies. For instance, the financial statements for each of the Companies most recently provided to Plaintiffs on June 4, 2018 misrepresent and understate the value of the Companies' assets, including the land and property, plant, and equipment of the Companies. Without complete and accurate financial information, Plaintiffs have no way to determine and/or verify the value of their shares for a proposed sale to Defendants, to other shareholders of the Companies, or to a third party.

m. In June 2018, Plaintiffs once again tried to resolve their issues with the Defendants through several communications with the Companies' counsel. On July 2, 2018, counsel for the Companies rejected Plaintiffs' efforts to have the Companies address their concerns, stating that the Companies "have wasted enough time and effort" dealing with Plaintiffs.

50. Defendants do not want to share the underlying accounting records with Plaintiffs because Defendants do not want Plaintiffs to know the true value of the Companies (and, in turn, Plaintiffs' ownership interest therein) or the extent of the Companies' assets in Wisconsin and elsewhere. Plaintiffs have discovered, through an independent investigation of the

23

facts supporting this Complaint, that Defendants, upon information and belief, have fraudulently concealed from Plaintiffs assets owned by the Companies. While the investigation is ongoing, the currently available information indicates that the Companies have hidden property and operations outside of the Companies' books that may be valued at tens of millions of dollars. Keeping this property off the books allows Defendants to artificially depress the book value of Plaintiffs' shares to Plaintiffs' detriment and the majority shareholders' benefit; and upon information and belief, appears on its face to be fraudulent and oppressive under Wisconsin law.

51. As stated above, in early 2016, Plaintiffs sought information from the Companies, including a list of all real property owned by the Companies, for the express purpose of determining the value of their holdings for purposes of selling their shares. On March 16, 2016, Defendants, through counsel, provided two lists that Defendants represented contained the entirety of P&D and NEA's real estate portfolio. The lists contained a total of REDACTED located in Wisconsin, Michigan, and Illinois.

52. Plaintiffs' independent investigation has revealed that the Companies failed to disclose a significant portion of their actual real estate holdings. For example, Plaintiffs discovered that P&D owned at least two (2) additional parcels and NEA owned at least twenty (20) additional parcels in Wisconsin alone that were omitted from the lists Defendants' counsel sent Plaintiffs' counsel. These parcels are comprised of more than 530 acres of land and contain highly valuable mining and business operations worth millions of dollars annually. Plaintiffs also discovered that related entities, such as CRM and Premier Concrete (a direct subsidiary of P&D), owned numerous parcels comprised of hundreds of acres of land in Wisconsin.

53. Under GAAP, the Companies are each required to list on their balance sheets all of the land and property, plant, and equipment that they each own. GAAP permits

companies to list the aggregate land and aggregate property, plant, and equipment holdings on the balance sheet so long as *all* land and property, plant, and equipment is included in such aggregate totals. Defendants failed to disclose these numerous valuable properties to Plaintiffs. If the undisclosed parcels are not included in the financial statements of the Companies, the financial statements are fraudulent and the Companies have failed to comply with GAAP when preparing their financial statements.

54. Plaintiffs' investigation further uncovered that the Companies may possess valuable permits to mine the undisclosed properties. It is unknown whether revenue from operations on undisclosed properties is reported on the Companies' books because the Companies refused to provide the accounting records underlying the limited financial statements that Defendants did provide to Plaintiffs. Omission of such crucial information is highly material, and is evidence of breach of fiduciary duty, bad faith, concealment, and the systematic attempt to deprive Plaintiffs' of the value of their shares in the Companies.

55. The Companies also appear to be using aliases and engaging in joint venture partnerships with separate entities as part of an effort to obfuscate sources and amounts of revenue and income-producing assets. Through aerial image research and review of public databases, Plaintiffs have identified dozens of possible joint venture partners that have never been disclosed to Plaintiffs. These possible joint ventures include entities with similar names to the Companies (such as various "P&Q" entities), entities that own properties adjacent to parcels owned by the Companies or their subsidiaries, and entities with the same registered agent or address as the Companies or their subsidiaries.

56. In examining information from the Wisconsin Division of Executive Budget regarding contracts and expenditures, Plaintiffs discovered that the Companies

collectively received payments totaling, on average, $160.7 million annually from contracts with the state for fiscal years 2014 to 2018. For fiscal years 2014 to 2016, P&D alone received more than $140 million from the State. However, P&D is not listed as receiving *any* payments in fiscal years 2017 and 2018. Upon further investigation, it was discovered that, beginning in fiscal year 2017, P&D received all payments under the name "Franklin Aggregates"—totaling $81.8 million over these two fiscal years. Name changes like this make it more difficult to track revenue generated by P&D and the rest of the Companies, and thus more difficult to determine the value of the Companies.

57. All of these companies and transactions have been withheld from Plaintiffs, and by doing so, Defendants have misrepresented the true value of the Companies in which Plaintiffs own a significant minority interest. It is unknown whether revenue from non-disclosed joint venture operations were reported on the Companies' books because the Companies refused to provide the accounting records underlying the limited financial statements that Defendants did provide to Plaintiffs.

58. The Companies' failure to disclose significant portions of the their real estate holdings, the true value of the Companies' assets, and possible joint venture commercial relationships is part of a concerted effort by the Companies and the Individual Defendants to harm Plaintiffs and prevent them from obtaining fair value for their shares.

59. Kurt Bechthold maintains control of the Companies on a strategic level, is the principal authority figure with final say on decisions with respect to the Companies, and has taken actions, and directed the other Individual Defendants to take actions, necessary to accomplish the scheme to defraud Plaintiffs out of the fair value of their shares. From and through his business and familial relationships, including his positions of responsibilities at the

Companies and his familial and personal relationships with the other Bechtholds (including David) and Filmanowicz and Sorenson, he has conducted and been a central participant in the scheme to defraud Plaintiffs. Kurt has and will benefit from the scheme personally by preventing the Companies or himself from paying fair market value for Plaintiffs' interests.

60.     The other Individual Defendants—Filmanowicz (the Companies' current President), David Bechthold (the Companies' current Chief Financial Officer), and Sorenson (the Companies' former longstanding Chief Financial Officer)—have acted at Kurt's direction and in their own interest to lower the book value of the Companies through overly aggressive accounting practices, the hiding of assets, falsifying financial records by failing to include the value of the Companies' assets, and deceiving Plaintiffs about the activities of the Companies.

61.     Defendants' conduct renders it impossible for Plaintiffs to determine the true book value, much less the actual fair value, of their holdings and renders the minimal financial information that the Companies have provided to Plaintiffs entirely suspect. This conduct is directed solely at the Plaintiffs as the only interested sellers of their interests, the only shareholders who have demanded financial and property records from the Companies, and the only shareholders who are not privy to accurate and complete information about the Companies' value, assets, and ownership interests.

62.     Defendants individually and together are depriving Plaintiffs of information to which Plaintiffs, as shareholders, are entitled. Defendants have breached fiduciary duties, acted in bad faith, and engaged in an oppression freeze out/squeeze out scheme to diminish the value of Plaintiffs' ownership interest in the Companies by, among other things:

  a.  Consolidating and aggregating voting control over Companies' shares so that
      Kurt, David, and those loyal to the Bechtholds have majority control over all
      activities of all Companies, and vote all shares and interests as a bloc against
      Plaintiffs' interests;

27

b.  Ignoring the requirement in the Companies' bylaws that book value be calculated according to GAAP principles, for the purpose of devaluing the book value of Plaintiffs' interests;

c.  Requiring that the Companies maintain a right of first refusal on sales of any shares by Plaintiffs at book value, which is oppressive and limits severely the value of Plaintiffs' shares and their marketability;

d.  Instituting non-GAAP, hyper-aggressive depreciation of asset accounting techniques that remove millions of dollars of market value from assets used to compute the book value of the Companies, in order to severely depress the value of Plaintiffs' ownership; and

e.  Deliberately using the Companies' resources and assets to acquire, build, and hold assets, and/or operate properties and obtain revenue, outside the Companies, thereby engaging in improper transactions which wholly deny Plaintiffs their value.

63.  Federal courts have the equitable authority to appoint receivers to meet the needs of the case. Given Defendants' refusal to provide the accounting records underlying the Companies' financial statements and fraudulent manipulation of the Companies' financial statements, a receiver is necessary here to independently investigate the Companies' books and records and determine the value of the Companies and Plaintiffs' ownership interests therein.

64.  Plaintiffs seek appointment of a receiver for the limited purpose of (1) conducting a forensic accounting of the Companies' accounting records; (2) identifying any and all assets and interests owned by the Companies, including those assets and interests that are not included in the Companies' accounting records; (3) determining whether the Companies engaged in improper transactions and/or whether the Companies' assets or opportunities have been used to purchase, establish, or support operations and/or businesses outside the ownership of Plaintiffs; and (4) determining the book value and fair market value of Plaintiffs' minority shareholder interests in the Companies.

28

## FIRST CLAIM FOR RELIEF
### (Fraud)

65.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

66.     Defendants' have made numerous false and misleading statements, including, without limitation:

    a.  False and misleading statements regarding the value of the Companies assets— including the land and property, plant, and equipment—as represented in the limited information Defendants made available to Plaintiffs, which includes 2016, 2017, and 2018 financial statements for the Companies that Defendants sent to Plaintiffs on June 4, 2018;

    b.  False and misleading statements regarding the Companies' real estate assets, including the misrepresentation that the two lists sent to Plaintiffs on March 17, 2016 showed all of the real estate owned by the Companies when in fact these lists concealed numerous valuable properties;

    c.  Defendants' false promises and statements that the Companies would not use John Dewey's vote at the June 2014 shareholder meeting to argue that he approved the 2014 Restriction.

67.     When Defendants made these statements, Defendants knew that the statements were false, knew that Plaintiffs would rely upon them, and made them with the intent to deceive Plaintiffs. Defendants likewise knew that, unlike other shareholders in the Companies, Plaintiffs do not work at the Companies and have been refused access to critical financial and accounting information about the Companies. Defendants' false and misleading statements had the effect of manipulating the value of Plaintiffs' shares in the Companies and preventing Plaintiffs (and only Plaintiffs) from determining and verifying the value of their shares in the Companies.

68.     In reliance upon Defendants' false and misleading statements, Plaintiffs have not sold their shares of the Companies' stock. Had Defendants provided truthful

information regarding the value of the Companies, Plaintiffs would have sold all of their shares in the Companies for fair value.

69.    Plaintiffs have been harmed as a result of their inability to sell their shares and are entitled to damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Violation of Wis. Stat. § 180.1602)

70.    Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

71.    On January 12, 2018, Plaintiffs' provided Defendants with notice of their intent to examine corporate records pursuant to Wis. Stat. § 180.1602. Plaintiffs' request complied with all of the requirements of the statue. Plaintiffs had been shareholders for more than six months prior to the request, Plaintiffs provided the Companies with notice of their request more than five business days prior to the date upon which Plaintiffs requested the records, the request was made in good faith and clearly articulated its proper purpose, and the requested records were directly connected to this purpose.

72.    Defendants denied Plaintiffs' request for information pursuant to Wis. Stat. § 180.1602.

73.    Defendants' refusal to provide the requested accounting records was unjustified, oppressive, and violated Wis. Stat. § 180.1602.

74.    Plaintiffs have been directly and uniquely harmed by Defendants' conduct as the only shareholders who are not privy to the accounting records underlying the financial statements of the Companies.

75.    Plaintiffs are entitled to an Order to Inspect pursuant to Wis. Stat. § 180.1604, as well as to an award of the costs and expenses, including attorneys' fees, incurred in

securing the Order to Inspect.

## THIRD CLAIM FOR RELIEF
### (Common Law Claim for Access to Corporate Records)

76.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

77.     In addition to the statutory claim for accounting records, Wisconsin common law empowers this Court to give these shareholder Plaintiffs the right to access the corporate records of the Companies under these circumstances. *See* Wis. Stat. § 180.1602(4)(b) ("This section does not affect . . . [t]he power of a court, independently of this chapter, to compel the production of corporate records for examination.").

78.     The actions of Defendants as outlined in this Complaint, including concealing the Companies' assets, manipulating the book value of the Companies through various accounting schemes, and refusing to disclose to Plaintiffs the books and records they are entitled to receive, are common law grounds for this Court to enter an order to compel production of Defendants' accounting records for examination.

79.     This Court should order that Plaintiffs be allowed access to all books and records of Defendants demanded herein; and further, on common law grounds enter an order for the appointment of a receiver as set forth in the Eighth Claim for Relief in this Complaint, as well as an award of Plaintiffs' costs and expenses, including attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

80.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

81.     An actual case or controversy exists between the parties regarding the

31

applicability of the Companies' Transfer Restrictions to shares held by John Dewey.

82.     Pursuant to Wis. Stat. § 180.0627(2)(b), a transfer restrictions "may not affect shares and other securities issued before the restriction [was] adopted unless the holders of the shares and other securities [were] parties to the transfer restriction agreement or vote[d] in favor of the transfer restriction."

83.     The 1967 Restriction does not apply to John's shares because it was revoked and rendered a nullity when the Companies' bylaws were restated in 1993.

84.     The 1993 Restriction does not apply to John's shares because his shares were issued prior to the enactment of the bylaw containing the 1993 Restriction and he did not vote in favor of the 1993 Restriction.

85.     The 2014 Restriction does not apply to John's shares because his shares were issued prior to the enactment of the bylaws containing the 2014 Restriction and the Companies are estopped from asserting that John voted in favor of the 2014 Restriction.

86.     John is entitled to a declaration that, pursuant to Wis. Stat. § 180.0627(2)(b), his shares are not subject to any transfer restrictions.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

87.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

88.     An actual case or controversy exists between the parties regarding the enforceability of the Companies' Transfer Restrictions on Plaintiffs' shares.

89.     Pursuant to Wis. Stat. § 180.0627(4), transfer restrictions are generally permitted to the extent that they are not "manifestly unreasonable."

90.     However, the Transfer Restrictions in the bylaws for the Companies are

32

manifestly unreasonable because they require Plaintiffs to offer their shares to the Companies, and then the Companies' other shareholders, at "book value determined by the corporation's balance sheet included in its financial statements and stated in accordance with generally accepted accounting principles consistently applied as of the end of the calendar month preceding the offer to the corporation," and they therefore require Plaintiffs to offer to sell their shares at a fraction of the shares' fair value.

91.     The Transfer Restrictions are manifestly unreasonable because they require the application of book value methodology, which is an outmoded and flawed methodology for valuing a going concern operating company.

92.     The Transfer Restrictions are manifestly unreasonable because they purport to require Plaintiffs to hold their offer to the Companies open for thirty days and then hold their offer to the Companies' other shareholders open for an additional thirty days, and further purport to require Plaintiffs to restart this process if Plaintiffs do not sell their shares within sixty days of the expiration of the two thirty-day periods.

93.     The Transfer Restrictions are further manifestly unreasonable because of the manner in which the Companies have manipulated the book value of the Companies by over-aggressively depreciating assets and concealing assets from the financial statements.

94.     Plaintiffs, the only shareholders upon whom the Companies have attempted to enforce the Transfer Restrictions, and as the only shareholders who are not privy to the accounting records underlying the financial statements of the Companies, have been directly harmed by Defendants' attempts to enforce the Transfer Restrictions against Plaintiffs.

95.     Plaintiffs are entitled to a declaration that, pursuant to Wis. Stat. § 180.0627(4), the Transfer Restrictions are unreasonable and unenforceable. Plaintiffs are

likewise entitled to a declaration that the Transfer Restrictions constitute an unreasonable restriction on alienability and are therefore unenforceable.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

96.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

97.     The Individual Defendants were or are directors and officers of the Companies. As directors and officers of Wisconsin corporations, the Individual Defendants owe a fiduciary duty to Plaintiffs as minority shareholders of the Companies.

98.     In acting in the manner described in this Complaint, the Individual Defendants have breached the fiduciary duties they owe to Plaintiffs by, without limitation:

a.  Intentionally refusing to provide the "accounting records" of the Companies to Plaintiffs, despite proper statutory requests, for the sole purposes of preventing a meaningful book value or fair market valuation of the shares held by Plaintiffs, who are the only shareholders who want to value and sell their shares.

b.  Demanding that the Transfer Restrictions, which are commercially unreasonable and do not apply to John Dewey, be enforced to prevent a fair market sale of the shares held by Plaintiffs, who are the only shareholders who want to value and sell their shares.

c.  Intentionally disregarding the GAAP principles required by the Companies' bylaws, thereby depressing the book value of the Companies, for the sole purpose of diminishing the value of the shares held by Plaintiffs, who are the only shareholders who want to value and sell their shares.

d.  Orchestrating a scheme to hide assets and revenues and keep them off of the Companies' financial statements, thereby depressing the book value of the Companies, for the sole purpose of diminishing the value of the shares held by Plaintiffs, who are the only shareholders who want to value and sell their shares.

99.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs have been unable to sell their shares of the Companies' stock. Absent the Individual Defendants' breaches of their fiduciary duties, Plaintiffs would have sold all of their

34

shares in the Companies for fair value.

100.     Plaintiffs have been harmed as a result of their inability to sell their shares and are entitled to damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Shareholder Oppression – Wis. Stat. § 180.1430)

101.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

102.     The Companies are Wisconsin corporations formed under Chapter 180 of the Wisconsin Statutes.

103.     As detailed in this Complaint, the Defendants' conduct towards Plaintiffs has been and continues to be harsh, burdensome, and wrongful. Defendants' conduct lacks fair dealing to the prejudice and detriment of Plaintiffs. It further constitutes a departure from the standards of fair dealing, and is a violation of fair play on which every shareholder of a corporation is entitled to rely. In engaging in the conduct outlined in this Complaint, Defendants have frustrated Plaintiffs' reasonable expectations as minority shareholders.

104.     Defendants' oppressive, illegal, and/or fraudulent conduct includes, but is not limited to, intentionally manipulating the companies' financial statements to create an artificially depressed "book value" for shares that violates Companies requirement that book value be determined in accordance with GAAP; by unilaterally imposing a right of first refusal for the Companies or any other shareholder to purchase Plaintiffs' stock prior to sale to any third party; and further by forcing that first refusal purchase price to be at the artificially depressed *ultra vires* "book value" formula, all in order to deprive Plaintiffs of the full value of their holdings.

105.     Upon information and belief, Defendants further deliberately concealed

35

Company assets, revenues and operations, by titling property outside the ownership of Companies to the benefit of Defendants or other insiders; failed to account for and/or diverted revenues from the Companies; and committed other deliberate acts for the purpose of, and having the effect of, oppressing Plaintiffs, reducing and minimizing their ownership value, and squeezing them out of ownership of the Companies.

106.     Defendants' oppressive, illegal, and/or fraudulent conduct is causing Plaintiffs to suffer harm and entitles Plaintiffs to relief.

107.     Plaintiffs are not seeking judicial dissolution or liquidation of the Companies as a remedy for Defendants' oppressive, illegal, and/or fraudulent conduct. Instead, Plaintiffs ask this Court to exercise its equitable power to fashion alternative relief as may be just and appropriate under the circumstances, including, without limitation, ordering the appointment of a limited receiver as described in below in Plaintiffs' Eighth Claim for Relief; ordering the appointment of a limited receiver with other duties that fall short of dissolving the Companies but protect Plaintiffs' interests; ordering the appointment of a special fiscal agent; retaining jurisdiction to monitor Defendants' activities to protect Plaintiffs' interests; ordering an accounting; enjoining oppressive acts on the part of Defendants; requiring declaration of a dividend or a reduction and distribution of capital; ordering the Companies and/or the majority shareholders to purchase the stock of Plaintiffs at a fair and reasonable price; awarding damages to Plaintiffs as compensation for injury suffered by them as the result of oppressive conduct by Defendants; and/or any other relief the Court deems proper and just.

## EIGHTH CLAIM FOR RELIEF
### (Appointment of Receiver)

108.     Plaintiffs repeat and re-allege each and every averment set forth in the preceding paragraphs as if fully set forth herein.

36

109.	As part of their scheme to deny and conceal financial information from Plaintiffs and execute their freeze out/squeeze out oppression scheme, Defendants deviated from generally accepted accounting principles, manipulated financial statements, and fraudulently concealed assets from Plaintiffs.

110.	Under Federal Rule of Civil Procedure 66 and the Court's equitable powers, the Court has the ability to craft an equitable remedy to meet the needs of the case and do justice.

111.	Plaintiffs seek a court appointed a limited receiver for the purpose of: (1) conducting a forensic accounting of the Companies' accounting records; (2) identifying any and all assets and interests owned by the Companies, including those assets and interests that are not included in the Companies' accounting records; (3) determining whether the Companies engaged in improper transactions and/or whether the Companies' assets or opportunities have been used to purchase, establish, or support operations and/or businesses outside the ownership of Plaintiffs; and (4) determining the book value and fair market value of Plaintiffs' minority shareholder interests in the Companies.

**WHEREFORE**, Plaintiffs seek the following relief and demand judgment against Defendants as follows:

A.	An order to inspect pursuant to Wis. Stat. § 180.1604, and generally an order to open the books and records of the Companies to Plaintiffs, and the receiver, under the statutes and Wisconsin common law.

B.	An order declaring that Plaintiffs are entitled to all information necessary to calculate the value of their holdings in the Companies.

37

C. An order appointing a limited receiver for the purpose of: (1) conducting a forensic accounting of the Companies' accounting records; (2) identifying any and all assets and interests owned by the Companies, including those assets and interests that are not included in the Companies' accounting records; (3) determining whether the Companies engaged in improper transactions and/or whether the Companies' assets or opportunities have been used to purchase, establish, or support operations and/or businesses outside the ownership of Plaintiffs; and (4) determining the book value and fair market value of Plaintiffs' minority shareholder interests in the Companies.

D. An order declaring that, pursuant to Wis. Stat. § 180.0627(2)(b), the shares held by Mr. Dewey are not subject to any transfer restrictions.

E. An order declaring that the Transfer Restrictions are manifestly unreasonable and unenforceable.

F. Preliminary and permanently enjoining Defendants from taking any action to conceal assets of the Companies or otherwise manipulate downward the value of the Companies.

G. An order awarding Plaintiffs compensatory and punitive damages, all in amounts to be proven at trial, plus interest.

H. An order awarding to Plaintiffs their reasonable attorneys' fees and costs; and

I. Such other and further relief as the Court finds just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated: November 1, 2018                    Respectfully submitted,

                                           /s/ *Stephen E. Kravit* _____

Brian M. Lutz (*admission pending*)        Stephen E. Kravit

Gibson Dunn & Crutcher LLP
200 Park Avenue, 48th Floor
New York, New York 10166
Telephone: (212) 351-4000
BLutz@gibsondunn.com

Benjamin R. Prinsen
Stuart J. Check
Kravit, Hovel & Krawczyk s.c.
825 North Jefferson - Fifth Floor
Milwaukee, WI 53202
(414) 271-7100 - Telephone
kravit@kravitlaw.com
brp@kravitlaw.com
sjc@kravitlaw.com